# IN THE DISTRICT COURT OF THE UNITED STATES
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
### ASHEVILLE DIVISION
#### 1:15cr06

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | **MEMORANDUM AND** |
| **DOMINIQUE LAMAR FORE.** | ) | **RECOMMENDATION** |
| | ) | |
| **Defendant.** | ) | |
| _____ | ) | |

 **THIS MATTER** is before the Court upon Defendant's Motion to Suppress and Request for an Evidentiary Hearing (#11) and the Government's Response to Motion to Suppress (#14). The undersigned conducted a hearing on April 10, 2015, and heard evidence from the Government. After the hearing, counsel for Defendant and the Assistant United States Attorney requested an opportunity to provide additional briefs which were allowed by the undersigned (#18). Defendant filed an additional Brief in Support of Defendant's Motion to Suppress (#20) and the Government filed Government's Response to Defendant's Brief (#22). Having carefully considered the evidence and briefs, the Court enters the following findings, conclusions, and recommendation.

# FINDINGS AND CONCLUSIONS

## I.      Procedural Background

The grand jury issued a Bill of Indictment (#1) on February 4, 2015.  In count one, Defendant was charged with possessing a firearm and ammunition in or affecting commerce after having previously been convicted of at least one crime punishable by imprisonment for a term exceeding one year, in violation of 18 U.S.C. § 922(g)(1).  In count two, Defendant was charged with possession with intent to distribute heroin in violation of 21 U.S.C. § 841(a)(1).  In the third and final count, Defendant is charged with possession of a firearm in furtherance of a drug trafficking crime in violation of 18 U.S.C. § 924(c)(1)(A)(1).

Defendant then filed a Motion to Suppress (#11), to which the Government filed a response (#14).  A hearing was held on April 10, 2015, at which time testimony and other evidence was presented by the Government.  After the evidence was taken, counsel for Defendant and the United States Attorney requested an opportunity to provide additional briefs, which the Court allowed.

## II.     Factual Background

### A.      Bridgett Clark

At the hearing, the Government called Ms. Bridgett Clark as a witness.  Ms. Clark is the general manager of Value Place, which is an extended stay hotel located at 40 Monte Vista Road, Asheville, North Carolina.  (Hearing Tr. ("T") at 5.)  As a

part of Ms. Clark's duties as general manager, she is responsible for security. (T. at 6.)

The Value Place hotel is a four story structure with windows in every room of the hotel. (T. at 7.) The windows to each room have a "safety stop" that allow the window to open only for a space of about four inches. (T. at 9.) The "stop" is a safety device screwed into the window to prevent the window from being fully opened. (T. at 10.) As a result of being employed by the hotel and on the property for six years, Ms. Clark can look at the outside of a window of a room and determine if a "stop" has been removed. (T. at 10-11.) When Ms. Clark arrives for work in the morning she looks at the windows to see if the "stops" on the windows have been moved. (T. at 11-12.) If the "stops" have been moved and the window is open, Ms. Clark calls the occupant of the room to put the "stop" back in and if the occupant is not in the room Ms. Clark or the other employees enter the room and replace the "stops". (T. at 11-12.)

On May 27, 2014, Defendant and a young woman came to the Value Place hotel. (T. at 20, 65.) Defendant rented room 428 from Ms. Clark. (T. at 20, 65.) Defendant told Ms. Clark the young woman was his sister and she would not be staying in the room. (T. at 20, 65.) Ms. Clark went over the rules of occupancy with Defendant and required him to sign a check-in registration form. (T. at 20, 27; Gov.'s Ex. 1; Gov.'s Ex. 2; Def.'s Ex.1.) On the registration card which was executed and

signed by Defendant, it states: "By signing the registration form guest acknowledges receipt of hotel rules and check-in procedures in Guest Guide, which if broken, will lead to immediate eviction." (Def.'s Ex. No. 1.)  In the Guest Rules and Policies, Defendant was advised the following were part of the Guest Rules and Policies:

## GUEST RULES AND POLICIES

The following Guest Rules and Guest Policies are in place to ensure our promises of an affordable, clean, safe and simple guest experience for all guests.  Violation of any Guest Rule or Guest Policy may result in immediate ejection of you, your other room occupants and/or your invitees.

**Guest Rules:**
·Being involved in any police matter
·Possessing or using marijuana and/or any illegal substances, including drugs
·Possessing a weapon or firearm
·Having pets of any kind on the property
·Tampering with or removing window stops, smoke detectors and other safety measures
·Engaging in any activity that might jeopardize the safety and relative privacy of any Value Place guest or employee

**Guest Policies:**
·Damage, modification or destruction of hotel property by registered guests or their invitees may result in immediate ejection, and repair or replacement of property will be charged to the guest
·Management reserves the right to enter and inspect guest rooms at any time

(Gov.'s Ex. 2.)

Ms. Clark testified that possession of a weapon, firearm, marijuana or any illegal substance by a guestroom occupant or an invitee would result in immediate

4

ejection from the premises. (T. at 29.)

The next morning, May 28, 2014, Ms. Clark arrived at work at around 7:30 a.m. and performed a visual inspection of the exterior of the Value Place building to determine if any "window stops" had been removed and if windows were open. (T. at 12, 64, 67.)  Ms. Clark observed that two windows were open. (T. at 12.)  One of them was the window for room 428. (T. at 12, 67.)  Ms. Clark called room 428 and no one answered the phone. (T. at 12, 68.)  After making the call, Ms. Clark went to room 428 with a fellow employee, Debbie Ramsey. (T. at 33, 43, 68.)  Ms. Clark knocked on the door of room 428 three times but her knocks were unanswered.  (T. at 12, 14-15, 69.)  Ms. Clark then entered room 428 and found the windows were open and the "window stops" were not in the appropriate position. (T. at 12, 69.)  Ms. Clark closed the windows and screwed the "window stop" back in.  She then turned to leave and saw a quart-size clear container that was full of marijuana buds setting on the night stand.  (T. at 15, 16, 69-70.)  Ms. Clark then walked over to the night stand to look at the container of marijuana.  (T. at 15.)  She then saw the drawer to the night stand was open and there was a box of firearm ammunition in the drawer.  (T. at 16-17, 41-42, 70-71, 81.)  Ms. Clark then left room 428 and locked the door.  (T. at 72.)   She immediately went to her office and called the Asheville Police Department. (T. at 17, 72.)  She told police department personnel what she had seen in the room, the name of the Defendant, his driver's license number, and that she

was concerned a gun might be in the room. (T. at 17, 19, 52, 72.)

Four uniformed officers with the Asheville Police Department arrived shortly thereafter. (T. at 72-73.) Ms. Clark told the officers Defendant was not in the room. (T. at 22, 73.) The officers then stepped outside and stood in front of the hotel. (T. at 22, 73.) A member of Ms. Clark's staff then told Ms. Clark the occupants of room 428 were back and Ms. Clark went outside and told the officers that Defendant was back in the room. (T. at 22, 83, 73-74.) The officers then came back into the hotel and Ms. Clark accompanied four uniformed police officers on the elevator to the fourth floor. (T. at 45, 74.) Upon arriving at the fourth floor, the four officers went to the door of room of 428 while Ms. Clark waited approximately forty-five feet away. (T. at 24, 45, 75.) Ms. Clark saw one of the officers knock on the door and ask for the door to be opened using words such as "come on cuz". (T. at 25, 45-46, 75.) The door then opened and the officers went into the room. (T. at 75, 76.) Ms. Clark then left and went back to her office on the ground floor. (T. at 25, 76.)

**B.    Officer Sean Davis**

Sean Davis has been an officer with the Asheville Police Department for eight years. (T. at 85.) In May of 2014 he was a community resources officer for the West Asheville district of the Asheville Police Department. (T. at 86.) He is familiar with the Value Place hotel and its manager, Bridgett Clark. (T. at 86.) Ms. Clark would bring issues concerning the hotel to the police department and the police department

would act upon them. (T. at 87-88.) On May 28, 2014, Officer Davis was dispatched with other officers to the Value Place hotel because Ms. Clark had reported that there were narcotics and a firearm in room 428. (T. at 88; Gov.'s Ex. 3.) Officer Davis was the last officer of six to arrive. (T. at 89, 116.) Already there were Officers Masser, Dodd, Haralson, Griffin, and Sgt. Lance. (T. at 16.) At the hotel, Officer Davis encountered Ms. Clark who told him she observed marijuana and ammunition in room 428. (T. at 97-98.) Ms. Clark provided Officer Davis with a copy of the registration document and the print-out of Defendant's identification. (T. at 97- 98, 118.) She also told Officer Davis a young female had checked in with Defendant. (T. at 118.)

Officer Davis then met with the other five Asheville Police Officers, including Sgt. Lance. (T. at 99.) All of the officers then got into the elevator along with Ms. Clark. (T. at 99.) Sgt. Lance informed Officer Davis, in the elevator on the way up to room 428, that the officers were going to contact the Defendant and arrest him for outstanding warrants. (T. at 89, 97, 99; Gov.'s Ex. 3.) The officers had been advised by communications that there were two open and outstanding warrants for the Defendant and that the Defendant was a convicted felon. (T. at 94; Gov.'s Ex. #3.) Officer Davis stayed back from the door of room 428 with Ms. Clark to keep an eye on other rooms in the hotel hallway. (T. at 99, 120.)

At the door to the room, Sgt. Lance covered the eyehole or peephole opening

of the door with his hand and knocked on the door to room 428. (T. at 110, 120.) When it opened, Sgt. Lance and officers Dodd and Griffin went into the room. (T. at 100.) Officer Davis then heard a female shouting in room 428 and he went to the doorway of the room and requested the female to exit the room and speak to him. (T. at 101, 106, 121.) Officer Davis testified he went to the door of room 428 within ten to fifteen seconds of the other officers making entrance into the room and he saw Officer Griffin placing handcuffs on Defendant. (T. at 100, 102.) He also saw five to ten ladies' purses or handbags. (T. at 103.) When the female exited the room she was frantic, visibly upset, and expressing the fact that she wanted to leave. (T. at 104, 106, 121-121.) She was also talking on a cell phone. (T. at 104, 121-122.) In the hallway, Officer Davis explained to the female, Egypt Green, that the officers were there because of narcotics and a firearm. (T. at 104, 106, 125.) Ms. Green stated she needed a ride to get out of there, that she didn't know the items were present, and if they were there they were not hers. (T. at 105.) Officer Davis asked Ms. Green if the room contained any illegal items and she responded: "I don't know. You can go check." (T. at 105, 125.) Officer Davis then asked if the officers could search the room and Ms. Green replied: "Go ahead, I don't care. I just want to leave." (T. at 105, 125.)

Officer Davis did not tell Ms. Green she did not have to consent to the search. (T. at 129.) He did not ask Defendant to consent to a search of the room, nor did he

communicate with Defendant at any time. (T. at 129.) Ms. Green appeared to be in her early twenties but Officer Davis later found out Ms. Green was actually sixteen years of age. (T. at 108, 128-129.) Ms. Green was tall, slender and she was coherent and communicated well. (T. at 106-107.) Ms. Green stated she was the Defendant's fiancé. (T. at 109, 130.)

Officer Davis saw several items of female clothing and handbags in the room. (T. at 109.) Ms. Clark had told Officer Davis that Defendant had checked into the room with a young female the previous night. (T. at 109-110, 118, 128.) Officer Davis believed Ms. Green was staying in the room. (T. at 109, 128.) After Ms. Green stated the officer could search the room, Officer Davis then told Sgt. Lance that Ms. Greene had consented to the officers searching room 428. (T. at 114, 131.) After Defendant was taken into custody, Officer Davis saw Ms. Green and her mother in room 428 collecting items of female clothing, purses, and hygiene products from the bathroom into two 40-gallon black trash bags. (T. at 115.)

Other officers present in the room handed to Officer Davis a clear bag of brown powder which appeared to be heroin, which he secured and took to the office for field testing. (T. at 115-116, 133.)

### C.    Officer Travis Haralson

Travis Haralson has been a law enforcement officer with the Asheville Police Department for eleven years. (T. at 136.) On May 28, 2014, Officer Haralson was

a training officer for the West Asheville District, which included the location of the Value Place hotel. (T. at 137.) On May 28, 2014, Officer Haralson was dispatched to the Value Place hotel concerning drugs and a gun being found in a room at the hotel. (T. at 137, 166.) When Haralson arrived he found that Officer Masser was also present on the scene. (T. at 137.) Haralson called Sgt. Lance to tell him about the call and Lance came to the scene. (T. at 138.) While the officers were waiting outside, a clerk came out and stated that Defendant had arrived back at the hotel and was going inside. (T. at 138.) Dispatch called and stated that Defendant "had two warrants on him" but Haralson did not recall what crimes were charged in the warrants. (T. at 138, 166-167.) Haralson had seen a message indicating Defendant was a convicted felon. (T. at 139; Gov.'s Ex. 3.) Sgt. Lance told Haralson and other officers that had gathered that they would go up to the room, knock on the door, and "we'll go from there." (T. at 139.)

When the officers arrived at the door to room 428, Sgt. Lance covered the peephole of the door and knocked on the door. (T. at 139, 162.) A voice from inside the room asked "Who is it?" (T. at 139, 162.) Lance then said a name twice and Defendant then opened the door. (T. at 139, 162-163.) At that point, Officers Griffin and Dodd went into the room and arrested Defendant. (T. at 140.) About thirty to forty-five seconds after Defendant was arrested, Officer Haralson went into the room to do a protective sweep. (T. at 140, 176.)

Officer Haralson had seen Ms. Green exit the room before he entered. (T. at 141.) Ms. Green was agitated, nervous, and stated: "I just want to get my stuff and go." (T. at 168.) One of the officers who was in the room told Defendant there were warrants for Defendant's arrest and the Defendant was handcuffed. (T. at 141.) Haralson then went into the room to make sure no one else was there. (T. at 142.) Haralson first looked into a bathroom and saw a hair dryer, curling iron, and perfume bottle. (T. at 143, 158.) He then left the bathroom and looked further into the hotel room itself and saw clothes on the bed, some purses, and boxes of shoes. (T. at 142-143.) He then saw a purple Crown Royal bag upon the night stand with a jar sticking out of the Crown Royal bag. (T. at 144, 145, 160.) Haralson walked over to the bag and jar and saw what he believed was marijuana in the jar. (T. at 144, 165.) The jar was a clear glass jar approximately six inches in height and appeared to be a Mason jar with a metal lid. (T. at 144, 151, 165.) In the jar were loose round buds that Haralson believed to be marijuana. (T. at 144.) When Haralson went into the room he could smell marijuana. (T. at 144-145.) Haralson grabbed the jar and lifted it up and set it upon the bed in the room. (T. at 145.) Haralson then asked "Whose is this?" as he was looking at the jar of marijuana. (T. at 148, 149, 164-165.) Defendant responded that the marijuana was his. (T. at 149.) When Haralson picked up the jar, a case fell from the bag. (T. at 146.) The case was four to five inches in length and looked like an eyeglass case. (T. at 152.) Haralson opened the

11

case to see if it contained any drug paraphernalia. (T. at 146, 161.) In the case he found a plastic zip lock bag that contained a light tan colored substance that was later found to be heroin. (T. at 147.) Haralson then placed the plastic bag upon the bed. (T. at 147.)

In a drawer of the night stand that was opened approximately two-inches, Haralson could see a box of firearm ammunition. (T. at 147-148, 160.) Haralson then opened the drawer and picked up the ammunition box and placed it on the bed. (T. at 148, 161-162.) Photographs were then taken of the jar of marijuana, plastic bag, a glass pipe, digital scales, and Crown Royal bag. (T. at 150; Gov.'s Ex. 4; Gov.'s Ex. 5.) All of these items were found between three to four minutes after Sgt. Lance knocked on the door of room 428. (T. at 153.)

After finding the jar, Crown Royal bag, and eyeglass case, Officer Haralson looked under the bed and saw a black duffel bag. (T. at 154, 159.) Haralson pulled it out, set it on the bed and opened the bag. (T. at 154.) He found some hand bags and purses and a "soccer sack." (T. at 154.) The soccer sack is a bag that has straps which allows the bag to be worn as a small back pack. (T. at 154.) Inside the "soccer sack", Haralson found a loaded .9mm pistol. (T. at 154.) The ammunition in the pistol was the same ammunition that was in the ammunition box found in the open drawer of the night stand. (T. at 155.)

At no time during the search of the room did Officer Haralson obtain

12

Defendant's consent to search the room. (T. at 156.) Defendant was not asked to consent for Haralson to look underneath the bed while Haralson was searching the room. (T. at 159.) Defendant was taken out of the room at some point by Officers Dodd and Griffin. (T. at 163.)

### D. Officer Prentice Griffin

On May 28, 2014, Officer Prentice Griffin was a police officer in training with the Asheville Police Department. (T. at 170.) On that date he was riding in a patrol car with his training officer, that being Officer Dodd. (T. at 171.) Griffin and Dodd received a radio call to go to the Value Place hotel on Monte Vista Road in Asheville, North Carolina. (T. at 171.) While in route, communications advised Griffin and Dodd that someone on the staff at the hotel had seen a gun and drugs and had called the police. (T. at 171.) Officers Griffin and Dodd was then later advised by communications there were two open warrants on the Defendant. (T. at 171.)

Upon arrival, the officers, including Sgt. Lance, planned to make contact with the Defendant, confirm it was the Defendant in the room, and if so, place Defendant under arrest. (T. at 172.) While standing outside the hotel, an employee of the hotel told the officers Defendant had left the room, but she had seen him return, park his car, and walk inside of the hotel. (T. at 172.)

When the officers arrived at the room Sgt. Lance knocked on the door, covered the peephole with his thumb, and gave a false name of "Irvin." (T. at 172.)

13

Defendant opened the door and Griffin confirmed that the person in the room was Defendant Fore, and he told Defendant he was under arrest. (T. at 173.) It was Officer Griffin's job to take custody of the Defendant. (T. at 180.) Defendant turned around, put his hands behind his back, and Griffin placed handcuffs on Defendant. (T. at 173.) Officer Haralson then entered the room to perform a protective sweep. (T. at 176.) Officer Griffin then told Defendant to lean against a wall of the room but Defendant kept moving to the kitchen counter in the room, where he broke a cellular telephone behind his back. (T. at 174, 175.) At that point, Defendant was moved out of the room into the hallway of the hotel. (T. at 174.) The decision to remove Defendant to the hallway was made two or three minutes after entry into the room. (T. at 176.)

While entering the room, Officer Griffin noticed Defendant's girlfriend. (T. at 174.) She appeared to be in her early twenties or late teens and was upset and visibly pregnant. (T. at 174-175.) Defendant was yelling at his girlfriend "You got to get my stuff, you got to get my stuff." (T. at 175, 183.) Defendant's girlfriend replied to the Defendant that she would get it. (T. at 183.) While out in the hallway, Defendant continued to yell at Ms. Green and the officers then separated the Defendant and Ms. Green. (T. at 176.)

Officer Griffin took custody of a jar of marijuana, a firearm, and a box of ammunition. (T. at 178-179.) He also found four or five cell phones, including the

one Defendant had broken, and some scales, plastic bag packaging materials, and a plastic pipe. (T. at 179.)

Officer Griffin testified that at no point did he or any other officer advise the Defendant of his "Miranda" rights and warnings. (T. at 181.) Officer Griffin did not ask the Defendant for permission to search the room nor did he ask Ms. Green's permission to search the room. (T. at 184-185.) Officer Griffin did not hear any officer asked for Defendant's or Ms. Green's permission to search the room. (T. at 184-185.) He was never told Ms. Green had given permission to search the room. Officer Griffin testified that one of the outstanding arrest warrants for Defendant was for driving while license revoked and he could not remember the crime charged in the other warrant. (T. at 185, 187.) At the time of the arrest, he did not know what crime was charged in either of the warrants for arrest. (T. 187.) Officer Griffin further testified that if he encountered a person for which there is an open warrant for arrest, he has to arrest that person. (T. 188.)

## III.   Legal Standard

The Fourth Amendment to the United States Constitution provides:

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue but upon probable cause, supported by oath or affirmation and particularly describing the place to be searched and the persons or things to be seized.

U.S. Const. amend 4. "It is well settled under the Fourth and Fourteenth

Amendments that a search conducted without a warrant issued upon probable cause is per se unreasonable . . . subject only to a few specifically established and well-delineated exceptions." Schneckloth v. Bustamonte, 412 U.S. 218, 219, 93 S. Ct. 2041, 2043 (1973) (internal quotation and citation omitted); United States v. Lattimore¸ 87 F.3d 647, 650 (4th Cir. 1996). Pursuant to the exclusionary rule, "evidence obtained in violation of the Fourth Amendment cannot be used in a criminal proceeding against the victim of the illegal search and seizure." United States v. Calandra, 414 U.S. 338, 347, 94 S. Ct. 613, 619 (1974).

The Government contends that several of the recognized exceptions to a warrantless search are applicable in this case. First, the Government contends that the officers searched room 428 pursuant to a valid consent. Alternatively, the Government contends that the items found during the search of room 428 should not be excluded because the search was made incident to an arrest and the evidence at issue is admissible under the plain view doctrine. Finally, the Government contends that under the inevitable discovery rule the items found would be admissible as evidence. Defendant also contends his statement concerning ownership of the marijuana should be suppressed, which is not contested. The Court will address each contention separately.

IV.     **Analysis**

    A.     **Defendant's Statement of Drug Ownership**

Pursuant to <u>Miranda v. Arizona</u>, 384 U.S. 436, 86 S. Ct. 1602 (1966), police officers must warn a suspect of his or her right to remain silent and right to the presence of an attorney prior to undertaking custodial questioning. <u>Maryland v. Shatzer</u>, 559 U.S. 98, 103-04, 130 S. Ct. 1213, 1219 (2010); <u>Thompson v. Keohane</u>, 516 U.S. 99, 102, 116 S. Ct. 457, 461 (1995). While examining the jar of marijuana, Officer Haralson lifted up the jar and asked, "whose is this?" (T. at 148-49, 154-55.) Defendant, who was in handcuffs and in custody at the time (T. at 148-49), had not been advised of his <u>Miranda</u> rights (T. at 181). Defendant responded to Officer Haralson's question by stating that the jar was his. (T. at 148.) The Government offers no argument that this statement by Defendant is admissible at trial and specifically states that it will not attempt to offer the statement at trial. As a result, the Court finds that the statement by Defendant – "that's mine" – in response to Officer Haralson's question as to ownership of the jar is inadmissible at trial and the Court **RECOMMENDS** that the District Court **GRANT** the Motion to Suppress as to this statement.

### B.     Items in Plain View During the Protective Sweep

A valid arrest warrant carries with it the authority to enter the home of a person to be arrested and arrest the person, assuming there is reason to believe the person may be inside. <u>Maryland v. Buie</u>, 494 U.S. 325, 330, 110 S. Ct. 1093, 1096 (1990); <u>Payton v. New York</u>, 445 U.S. 573, 602-03, 100 S. Ct. 1371, 1388-1389 (1980).

Once the individual is found and detained, however, officers may generally not enter any additional rooms that had not been searched while executing the arrest warrant. Buie, 494 U.S. at 332-33, 110 S. Ct. at 1097. As an incident to the arrest, the officers may also "as a precautionary matter and without probable cause or reasonable suspicion, look in closets and other spaces immediately adjoining the place of arrest from which an attack could be immediately launched." Id. at 334, 110 S. Ct. at 1099. The focus of a protective sweep is the protection of the arresting officers and the search of the premises is limited to a cursory inspection of the spaces where a person could be found. Id. Moreover, officers may only conducted such a sweep when it is justified by a reasonable, articulable suspicion that the home is harboring an individual that might pose a danger to the arresting officers. Id. As the Fourth Circuit has explained:

> A protective sweep is limited to "a cursory inspection of those spaces where a person may be found" and should last "no longer than it takes to complete the arrest and depart the premises." Buie, 494 U.S. at 335–36, 110 S. Ct. 1093. We have distilled this language to indicate that "the sweep may last no longer than needed 'to dispel the reasonable suspicion of danger' and no longer than needed to arrest the suspect and leave the premises." United States v. Green, 599 F.3d 360, 376 (4th Cir. 2010) (quoting Buie, 494 U.S. at 335–36, 110 S. Ct. 1093). We recently noted that the "linchpin of the protective sweep analysis is not 'the threat posed by the arrestee, [but] the safety threat posed by the house, or more properly by unseen third parties in the house.' " Jones, 667 F.3d at 484 (quoting Buie, 494 U.S. at 336, 110 S.Ct. 1093). Cf. Mora v. City of Gaithersburg, 519 F.3d 216, 226 (4th Cir. 2008) (upholding a preventive search when officers "did not and could not fully know the dimensions of the threat they faced").

Uunited States v. Laudermilt, 677 F.3d 605, 610 (4th Cir. 2012).

Here, the officers approached the hotel room to execute an arrest warrant. The officers also had a report of drugs and either ammunition or a gun in the hotel room. Thus, the officers had a reasonable belief that illegal drug activity was occurring within the hotel room. Immediately upon entering the room and arresting Defendant, Officer Haralson conducted a protective sweep of the hotel room to make sure that no one else was in the room. Based on the facts in the record, the Court finds that Officer Haralson was justified in conducting a protective sweep of the room to make sure that no other individuals were hiding in the hotel room, including looking under the bed. While conducting this protective sweep, Officer Haralson was also justified in seizing any evidence in plain view. See United States v. Williams, 592 F.3d 511, 521 (4th Cir. 2010).

The plain view doctrine is another well-established exception to the general rule that a warrantless search is per se unreasonable. Id. Pursuant to this doctrine, officers may seize evidence in plain view during a lawful search where: (1) the officer that seizes the evidence is lawfully present at the place from which he can plainly observe the evidence; (2) the officer has a lawful right of access to the object; and (3) the incriminating character of the object is immediately apparent. Id.; United States v. Jackson, 131 F.3d 1105, 1108-09 (4th Cir. 1997). "The plain-view doctrine

is grounded on the proposition that once police are lawfully in a position to observe an item first-hand, its owner's privacy interest in that item is lost; the owner may retain the incidents of title and possession but not privacy." Williams, 592 F.3d at 521 (internal quotation and citation omitted).

Moreover, even where the seizure of a container is warranted under the plain view doctrine, the doctrine may not allow officers to actually search that container. As the Fourth Circuit has explained:

> Having concluded that the warrantless seizure of the packages was lawful, we must now resolve whether the warrantless search of the packages was likewise lawful because, although the plain view doctrine may support the warrantless seizure of a container believed to contain contraband, any subsequent search of its concealed contents must either be accompanied by a search warrant or justified by one of the exceptions to the warrant requirement. See Jacobsen, 466 U.S. at 114, 104 S. Ct. at 1657 ("[e]ven when government agents may lawfully seize ... a package to protect loss or destruction of suspected contraband, the Fourth Amendment requires that they obtain a warrant before examining the contents of such a package") (footnote omitted); Texas v. Brown, 460 U.S. 730 at 749–51, 103 S. Ct. 1535 at 1547–48, 75 L.Ed.2d 502 (1983) (Stevens, J., concurring) (plain view doctrine supports the warrantless seizure of a closed container but not the warrantless search of its contents that were not visible to the police); United States v. Corral, 970 F.2d 719, 725 (10th Cir.1992) ("In cases involving closed containers ... the plain view doctrine may support the warrantless seizure of a container believed to contain contraband but any subsequent search of the concealed contents of the container must be accompanied by a warrant or justified by one of the exceptions to the warrant requirement."). Courts have drawn a distinction between the plain view seizure of a container and the subsequent search of that container, because its seizure under the plain view doctrine "does not compromise the interest in preserving the privacy of its contents," while its search does. Horton, 496 U.S. at 141 n. 11, 110 S. Ct. at 2310 n. 11;

see United States v. Donnes, 947 F.2d 1430, 1436–37 (10th Cir.1991).

As a consequence, to protect the privacy interest of the contents of a container, courts will allow a search of a container following its plain view seizure only "where the contents of a seized container are a foregone conclusion." Corral, 970 F.2d at 725. The court in Corral reasoned that "when a container is not closed, or transparent, or when its distinctive configuration proclaims its contents, the container supports no reasonable expectation of privacy and the contents can be said to be in plain view." Id. (internal quotations omitted) (citations omitted). In determining whether the contents of a container are a foregone conclusion, the circumstances under which an officer finds the container may add to the apparent nature of its contents. See Blair v. United States, 665 F.2d 500, 507 (4th Cir.1981) (considering the circumstances in which the containers were found in upholding the warrantless search of closed marijuana bales under the plain view doctrine).

United States v. Williams, 41 F.3d 192, 196 (4th Cir. 1994).

As a threshold matter, the officers were lawfully present in the hotel room to execute the arrest warrant. And as the Court has already determined, the officers did not violate the Fourth Amendment by conducting a protective sweep of the hotel room to ensure that no one else was present. While performing this protective sweep, Officer Haralson observed a clear jar containing marijuana on a nightstand located in a Crown Royal bag. In addition, Officer Haralson observed a box of ammunition in an open drawer of the nightstand. Officer Haralson did not have to remove the Crown Royal bag to see the marijuana, and he did not open the drawer to see the ammunition. Both items were readily visible to an officer in the

area and the incriminating character of both objects was immediately apparent. The incriminating character of the ammunition was provided by dispatch, which advised the officers that Defendant was a convicted felon, making his possession of both the ammunition and any firearm illegal. 18 U.S.C. § 922(g). Finally, even if Officer Haralson moved a few steps closer to the jar to see it more clearly, such a minor detour within the hotel room to get a better look at evidence in plain view would not violate the Fourth Amendment. See Jackson, 131 F.3d at 1110 ("We can find no decision that finds unreasonable, and therefore unconstitutional, such a minor detour, especially where the detour was within an area where the officer was authorized to be, and where the officer was attempting to obtain a better look at evidence in plain view. Indeed, the law is to the contrary."). Accordingly, both the ammunition and marijuana is admissible at trial as both were properly seized without the need for a search warrant.

The heroin contained in the closed eyeglass case and the gun located in the duffle bag under the bed, however, are a different story. While conducting a protective sweep, Officer Haralson was not authorized to open closed containers or conduct any more of a search than was necessary to ensure that no other individual was present in the hotel room. See Laudermilt, 677 F.3d at 610. Moreover, neither the eyeglass case nor the duffle bag were on Defendant's person, and the Government failed to demonstrate that the search of either of these closed

containers was incident to Defendant's arrest in order to remove any weapons that Defendant might seek to use to resist arrest or evidence that he might destroy. See generally United States v. Currence, 446 F.3d 554, 556-57 (4th Cir. 2006). At the time of the search, Defendant was still in the room but in handcuffs with his hands behind him. (T. at 141-42, 176.) At least four officers were also present in the hotel room. (T. at 149.) When Officer Haralson opened the eyeglass case he did not believe that it could contain a weapon but, rather, might contain drug paraphernalia. (T. at 146.) The officers then removed the Defendant from the room within a couple of minutes. (T. at 176.) Officer Haralson, however, continued searching the premises for ten or fifteen minutes, including looking under the bed and discovering the black duffle bag (T. at 154, 159.) Upon opening the duffle bag, Officer Haralson observed a second bag, which contained the .9mm pistol. (T. at 154.) A gun contained in a closed bag inside another closed bag hidden under the bed is not within the grab area of a handcuffed defendant who is no longer in the hotel room and surrounded by multiple officers. Even if Defendant was still in the room at the time of the search of the duffle bag, the Government failed to demonstrate that the search of either the duffle bag or the eyeglass case was incident to Defendant's arrest. Thus, neither search falls under this exception to the warrant requirement.

**C.    Consent**

One of the established exceptions to the requirement for a warrant prior to conducting a search is where the search is conducted pursuant to valid consent. Schneckloth, 412 U.S. at 219, 93 S. Ct. at 2043-44; Lattimore, 87 F.3d at 650. Where a Defendant challenges such a search, the Government must prove by a preponderance of the evidence that it obtained valid consent to search the premises. United States. v. Buckner, 473 F.3d 551, 554 (4th Cir. 2007). The consent to search must be freely and voluntarily given based on the totality of the circumstances. United States v. Boone, 245 F.3d 352, 362 (4th Cir. 2001); Lattimore, 87 F.3d at 650. Where or not a consent is voluntary is a factual question for the District Court. Lattimore, 87 F.3d at 650.

> Factors that are appropriate for the district court to consider include the characteristics of the accused (such as age, maturity, education, intelligence, and experience) and the conditions under which the consent to search was given (such as the officer's conduct, the number of officers present, and the duration of the encounter). See Lattimore, 87 F.3d at 650. Whether the accused knew he possessed a right to refuse consent is a relevant factor, but the government need not demonstrate that the defendant knew of his right to refuse consent to prove that consent was voluntary. See Lattimore, 87 F.3d at 650

Boone, 245 F.3d at 362-63. Here, the Defendant did not consent to the search of the motel room. Rather, the Government contends that Ms. Green consented to the search.

Under certain circumstances, a fellow occupant sharing common authority

over property may consent to a search.  See Georgia vs Randolph, 547 U.S. 103, 109, 126 S. Ct. 1515, 1520 (2006).   As the United States Court of Appeals for the Fourth Circuit has explained:

> A third-party has authority to consent to a search of property when she possesses "common authority over or other sufficient relationship to the ... effects sought to be inspected." United States v. Matlock, 415 U.S. 164, 171, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974). "Common authority" in this context is not merely a question of property interest. Rather, it requires evidence of "mutual use" by one generally having "joint access or control for most purposes." Id. at 171, n. 7, 94 S.Ct. 988. Such use makes it "reasonable to recognize that any of the co-[users] has the right to permit the inspection in h[er] own right and that the others have assumed the risk that one of their number might permit the common [effects] to be searched." Id.

United States vs Buckner, 473 F.3d 551, 554 (4th Cir. 2007).   Moreover, the Government need not demonstrate that the third party had actual authority to consent to the search; the Government need only demonstrate that the third party had apparent authority to consent.  Id. at 555.

> As long as "the facts available to the officer at the moment…'warrant a [person] of reasonable caution in the belief' that the consenting party had authority," apparent authority to consent exists, and evidence seized or searched pursuant to that consent need not be suppressed. *Id.* (*quoting* Terry v. Ohio, 392 U.S. 1, 21-22, 88 S. Ct. 1868, 20L.Ed.2d 889 (1968); *see also* Kinney, 953 F.2d at 866.

Id.

Whether the officers reasonably believed Ms. Green had authority to consent to a search of room 428 depends upon a review of the facts in light of the totality of

the circumstances known to the officers at the time of the search. <u>Buckner</u>, 473 F.3d at 554. When Officer Davis arrived at the Value Place hotel he was told by Ms. Clark that Defendant had checked in with a young female. (T. at 118.) When the officers went into the room, Davis heard a female in the room began to shout. (T. at 101, 106, 121.) Davis went to the door of room 428 within ten to fifteen seconds of the other officers making entrance into the room. When he did, he saw five to ten ladies purses or handbags in the room and female clothing. (T. at 103, 109.) When Davis asked Ms. Green to exit room 428, he explained to her that the officers were there because of narcotics and a firearm. (T. at 104, 106, 125.) Ms. Green replied she did not know the items were present and if they were, they were not hers. (T. at 105.) When he asked if the room contained any illegal items, Ms. Green voluntarily told him, "I don't know, you can go check." (T. at 105, 125.) When asked if the officers could search the room, Ms. Green stated "Go ahead, I don't care, I just want to leave." (T. at 105, 125.) Ms. Green appeared to Davis to be in her early twenties. (T. at 108.) She was coherent and conversed well. (T. at 106.) She told Davis she was Defendant's fiancé. (T. at 104, 130.) Davis believed Ms. Green was staying in the room. (T. at 109, 128.)

Defendant contends Officer Davis could not have a reasonable belief that Ms. Green had apparent authority to consent to the search. Defendant points out it was he that rented the room and not Ms. Green (T. at 57-58) and he told Ms. Clark that

Ms. Green was his sister and would not be staying in the room (T. at 58.)  Further, Defendant asserts Ms. Green was an emotional sixteen year old child who could not freely and voluntarily give consent to the search. These arguments, however, do not overcome the objective factors that were presented to Officer Davis, which demonstrate that a reasonable officer would have had an objective belief in Ms. Green's apparent authority to consent.

Although the Court questions why Defendant was not asked by any officer to consent to the search of the room, despite the fact he was present in room 428, the Court recognizes that the officers are under no obligation to do so under binding Supreme Court authority once Ms. Green consented to the search.  Based upon the totality of these circumstances known to Officer Davis, the Court finds that he had objective reasons to believe that Ms. Green had the apparent authority to consent to the search of room 428.  As such, the Court finds that the consent by Ms. Green provided the officers with a second valid reason to be in the area where the marijuana and ammunition were in plain view.

Even though the Court finds that consent to search was given by Ms. Green under her apparent authority, the Court finds that the consent to search is not so broad as the Government contends.  While Ms. Green could consent to the general entry of the room to look around, the Court finds that the Government has not demonstrated that she had the actual or apparent authority to consent to the search

of an enclosed space or container where Defendant has an increased expectation of privacy. Put another way, the Government has failed to demonstrate that Ms. Green had joint access or control over these closed containers such that she could consent to their search. See generally, Buckner, 473 F.3d at 554. As the Fourth Circuit has explained:

> [I]t is equally well settled that third person consent, no matter how voluntarily and unambiguously given, cannot validate a warrantless search when the circumstances provide no basis for a reasonable belief that shared or exclusive authority to permit inspection exists in the third person from any source, Stoner v. California, 376 U.S. at 489, 84 S. Ct. 889; nor even more certainly, when the circumstances manifest to the contrary that the absent target of the search retains an expectation of privacy in the place or object notwithstanding some appearance or claim of authority by the third person, Reeves v. Warden, 346 F.2d 915 (4th Cir. 1965); United States ex rel. Cabey v. Mazurkiewicz, 431 F.2d 839 (3d Cir. 1970); nor, still more certainly, when the retained expectation of privacy is manifest in the circumstances and the third person actually disclaims any right of access, United States v. Wilson, 536 F.2d 883 (9th Cir. 1976).

United States v. Black, 590 F.2d 535, 540 (4th Cir. 1978).

The Government has failed to demonstrate that Ms. Green had either the actual or apparent authority to consent to the search of the closed eyeglass case or the closed duffle bag, much less the closed bag contained inside a closed bag stored under a bed. In fact, the evidence suggest that the officers had actual knowledge prior to opening the eyeglass case that it likely belonged to Defendant as it was contained inside the crown royal bag next to the jar of

marijuana, which Defendant acknowledged was his. Similarly, there is no evidence that the officers had any reason to believe that the black duffle bag belonged to Ms. Green or that she had the authority to authorize the search of it, even if the containers were not locked. The officers knew that Defendant was staying in the hotel room and likely had his own suitcase or bag. It was not reasonable for the officers to believe that Ms. Green had the authority to consent to the search of Defendant's bags. As the Fourth Circuit has explained, closed containers have an increased expectation of privacy, even when those containers are in shared spaces:

> This is as it must be for the protection of one of the primary objects of people's ordinary expectations of privacy. Katz v. United States, 389 U. S. 347, 88 S. Ct. 507, 19 L.Ed.2d 576 (1967). Common experience of life, clearly a factor in assessing the existence and the reasonableness of privacy expectations, surely teaches all of us that the law's "enclosed spaces" mankind's valises, suitcases, footlockers, strong boxes, etc. are frequently the objects of his highest privacy expectations, and that the expectations may well be at their most intense when such effects are deposited temporarily or kept semi-permanently in public places or in places under the general control of another. Indeed, to the sojourner in our midst all of us at one time or another the suitcase or trunk may well constitute practically the sole repository of such expectations of privacy as are had.

Id. at 541; see also U.S. v. Presler, 610 F.2d 1206, 1213-14 (4th Cir. 1979); United States v. Gardner, No. 5:11-CR-228-FL, 2013 WL 361063, at *5-6 (E.D.N.C. Jan. 30, 2013).

Put simply, the Government has not shown by a preponderance of the

evidence that the officers obtained a valid consent to search the enclosed containers. Accordingly, the Court finds that the drugs contained in the eyeglass case and the gun located in the bag were seized as the result of an illegal search and, as such, are not admissible. The Court **RECOMMENDS** that the District Court **GRANT** the Motion to Suppress as to the gun and heroin.

### D.    The Other Items

Testimony was presented that other items were found in the room such as scales, plastic bags, cell phones, and a glass pipe. (T. at 179.) When a warrantless search has occurred, the burden of going forward with evidence, as well as the overall burden of proof, rests with the Government. Initially, the Defendant must show that there was no warrant for the search or arrest. The Government then must show by a preponderance of the evidence that the warrantless search was justified under one of the narrow exceptions to the rule requiring a search warrant. See 2 William E. Ringel, Searches and Seizures, Arrests and Confessions, § 20:12 (2nd ed. 2014). Here, no testimony was presented as to the circumstances of the discovery of these items. There was no evidence presented as to how or where these items were found. The Court finds that due to the lack of the evidence presented as to the circumstances of the seizures of these items, and the lack of evidence presented to show the warrantless discovery of these items was under one of the exceptions to the rule requiring a search warrant, the Court recommends that the District Court

**GRANT** the Motion to Suppress as to these items.


### E.     The Inevitable Discovery Doctrine

Under the inevitable discovery doctrine, articulated by the Supreme Court in

Nix v. Williams, 467 U.S. 431, 104 S. Ct. 2501 (1984), improperly seized evidence

may be admitted "[i]f the prosecution can establish by a preponderance of the

evidence that the information ultimately or inevitably would have been discovered

by lawful means . . . then the deterrence rational has so little basis that the evidence

should be received."   467 U.S. at 444, 104 S. Ct. at 2509.   "[T]he fact making

discovery inevitable must "arise from circumstances other than those disclosed by

the illegal search itself."   United States v. Thomas, 955 F.2d 207, 211 (4th Cir. 1992).

The Government has failed to establish by a preponderance of the evidence

that the heroin, gun, or other excluded evidence ultimately or inevitably would have

been discovered by lawful means.   The officers had reports of drugs and ammunition

in the hotel room.   Upon entering the room to arrest the Defendant, the reported

drugs and ammunition were in plain view in the approximate location of where they

had been reported by the hotel employee.   Although a search warrant for room 428

could have been obtained based upon the statements provided by Ms. Clark or after

the clear jar of marijuana and the ammunition had been found in the protective sweep

that was performed, the Government presented no evidence that the officers ever

considered or discussed obtaining a search warrant. The officers knew of the statements of Ms. Clark and they knew of the jar of marijuana and the ammunition that were found in plain sight at the time of the presumed alleged misconduct, but there has been no showing by the Government of what circumstances existed other than those revealed by the illegal search itself as to the presence of the gun and heroine. Moreover, the room was jointly occupied and Ms. Green was not arrested or detained. The Government has failed to set forth any evidence that the room would have been secured, that Ms. Green would not have been allowed to leave with items from the room once Defendant was arrested, or that the hotel would not have immediately cleaned out the room after Defendant's arrest. In short, the Court finds that the Government has not met its burden of showing that the inevitable discovery doctrine applies under the facts and circumstances of this case, nor has it established by a preponderance of the evidence the facts necessary to apply this doctrine.

## RECOMMENDATION

**IT IS, THEREFORE, RESPECTFULLY RECOMMENDED** that Defendant's Motion to Suppress as to the contents of the glasses case, the contents of the duffle bag and the soccer sack and the other items, except the jar of marijuana and its contents, the ammunition box and its contents be **ALLOWED** and Defendant's Motion to Suppress as to the clear jar of marijuana and its contents and

the ammunition box and its contents be **DENIED.** The undersigned will further recommend that Defendant's Motion to Suppress his oral statement that the marijuana in room 428 was his be **ALLOWED**.

Signed: September 18, 2015

Dennis L. Howell
United States Magistrate Judge

## **Time for Objections**

The parties are hereby advised that, pursuant to 28, United States Code, Section 636(b)(1)(C), and Rule 72, Federal Rules of Civil Procedure, written objections to the findings of fact, conclusions of law, and recommendation contained herein must be filed within **fourteen** (**14**) days of service of same. **Responses to the objections must be filed within fourteen (14) days of service of the objections.** Failure to file objections to this Memorandum and Recommendation with the district court will preclude the parties from raising such objections on appeal. Thomas v. Arn, 474 U.S. 140 (1985), reh'g denied, 474 U.S. 1111 (1986); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984).